UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.   CRIMINAL ACTION NO. 3:24-CR-97-KHJ-LGI-1

LENNELL ANTONIO MOORE, JR.

ORDER

Before the Court is Defendant Lennell Antonio Moore, Jr.'s [36] Motion for Review of Magistrate Judge LaKeysha Greer Isaac's [33] Order of Detention Pending Trial. For the reasons stated below, the Court denies the motion.

I.   Background

On October 8, 2024, a federal grand jury indicted Moore for illegally possessing a machinegun. Indictment [1] at 1; *see also* 18 U.S.C. §§ 922(o), 924(a)(2). Following Moore's arrest, the Magistrate Judge held a two-day detention hearing. Detention Hr'g Tr. [40], Nov. 4, 2024; Detention Hr'g Tr. [41], Nov. 8, 2024. At the hearing, the Government called Joshua Garrett, an ATF agent investigating Moore's case. [40] at 8–9. Garrett testified from his observations and from information told to him by John Ramsey, a detective investigating Moore for other crimes. *See, e.g., id.* at 16–17, 23, 39.

Garrett recounted that Mississippi Capitol Police stopped Moore on January 2, 2024. *Id.* at 10. Moore's vehicle—a Ford F-150—also contained Dominique Robinson and Jazion Bradfield, two of Moore's cousins. *Id.*; *see* [41] at 84, 93. As the

officers approached, they observed a Mini Draco AK pistol in plain view on the back passenger-side floorboard, and they smelled marijuana coming from the vehicle. [40] at 10–11. When ordered to exit the vehicle, Moore and his cousins at first argued but eventually complied after several requests. *Id.* at 11. A search revealed three more firearms: two Glock handguns in the center console and one under the driver's seat. *Id.* at 11–12, 22. The handguns in the console had "Glock switch[es]"[1] and extended magazines equipped. *Id.* at 12. Meanwhile, the pistol under the driver's seat (nearest to Bradfield) had an orange switch. *Id.* at 22. After Capitol Police secured the firearms, Garrett arrived and seized several cell phones from Moore and Robinson. *Id.* at 15, 39, 41.

      Ramsey later informed Garrett that Jackson Police Department officers had searched Moore's home. *Id.* at 13–14. In it, they discovered a Glock pistol box with a serial number matching one of the handguns in the center console. *Id.* After examining that handgun, investigators found that its original owner had reported it stolen. *Id.* at 15. Garrett then executed a search warrant for two of Moore's seized cell phones. *Id.* at 15–16. The search uncovered text conversations discussing switches. *Id.* at 16. In at least one conversation, Moore sought to buy a switch. *Id.* Capitol Police investigators also told Garrett that Moore appeared in amateur rap videos on YouTube under the alias "Junyah Dope AF." *Id.* One video—entitled

---

[1] Auto sears designed for Glock handguns are colloquially called "Glock switches" or "buttons." *See* [40] at 16. An auto sear is a device that "permits a shooter to fire multiple shots while engaging the trigger only once." *Garland v. Cargill*, 602 U.S. 406, 420 n.4 (2024). Thus, "modifying a semiautomatic rifle or handgun with an auto sear converts it into a machinegun." *Id.*

"Automatic"—depicted Moore and Bradfield rapping about switches, while Bradfield held a handgun equipped with an orange switch. *Id.* at 16–17, 21–22.

    Garrett added that state authorities had charged Moore with attempted murder, conspiracy, and shooting into an occupied vehicle for an ambush that occurred on Keele Street in Jackson around mid-July. *Id.* at 22–24. Noting that Moore owned a white Honda Accord (in addition to the Ford F-150), Garrett stated that the shooters used a white Accord and that a co-conspirator had linked Moore to the attack. *Id.* at 24, 30–31. Moreover, shell casings from the Keele Street shooting "connected to three homicides and two other aggravated assaults . . . in the Jackson area over the past couple of years." *Id.* at 29. One of those homicides included a murder on Jamaica Drive in Jackson near the beginning of August. *Id.* at 30. The Jamaica Drive shooters also used a white Honda Accord to perpetrate that murder, and location data placed Moore's Ford F-150 around Jamaica Drive at the same time. *Id.* at 30–31, 92–93. Authorities then charged Moore's half-brother, Gennady Cobbins, with capital murder for that killing. [41] at 80–81.

    Two days after the murder, assailants using rifles shot Moore on the highway. [40] at 32–33. Gunfire also hit a woman riding in the car with him. [41] at 104. Garrett reasoned that Moore probably suffered the attack as retaliation for the Keele Street or Jamaica Drive shootings. [40] at 32. That ambush left Moore hospitalized, confined to a wheelchair, and in need of physical therapy. *Id.* at 33, 51; [41] at 52. But Garrett testified that Moore still targeted the mother of the Jamaica Drive murder victim. [40] at 33–34. According to her, someone told her at the

3

victim's funeral that Moore had placed a bounty of $10,000-per-individual on her, her husband, and her son using Snapchat. *Id.* at 33.

After the state charged Moore with attempted murder, it released him for medical purposes and placed him under home confinement. *Id.* at 24–25. But Moore's monitoring device showed that he left his home multiple times, so a state court judge issued an arrest warrant for contempt of court based on that location data. *Id.* at 26, 90. At the detention hearing, Moore's counsel vigorously disputed the accuracy of that location data, and she presented testimony on the data's unreliability. *See, e.g.*, [41] at 21, 41–43. Following the hearing, the state court judge rescinded the arrest warrant because the president of the monitoring company testified to the data's unreliability. *See* Mun. Ct. Order [46-3]; *see also* [36] at 2; Gov't's Resp. [46] at 5–6, 6 n.3.

Additionally, Moore's counsel questioned Ramsey's credibility throughout the hearing (and the [36] Motion for Review). *See, e.g.*, [40] at 5, 43, 48, 72, 78, 83–85; [41] at 55–56, 71–72; [36] at 2–3, 4–6. Counsel's arguments imply that Ramsey testified falsely in Moore's state-court case and gave untruthful information to Moore's attorneys. *See* [41] at 55–56, 71–72; [36] at 2–3, 5. But in his order rescinding Moore's arrest warrant, the state court judge found that Ramsey "acted in good faith at all times and testified truthfully based on the information he had." [46-3]; *see also* [41] at 79.

Finally, Moore's mother, Shadow Robinson, testified at the detention hearing. [41] at 46. She noted that Moore had been charged with possessing a deadly

4

weapon—apparently a small knife—on educational property, but she claimed that the charge was non-adjudicated. *Id.* at 48–50, 117. She then explained that Moore worked in the real estate business and sold cars. *Id.* at 47, 64, 117. And she noted that Moore's detention had interfered with his physical therapy. *See id.* at 75–76.

Except for the order rescinding Moore's arrest warrant, the Magistrate Judge considered the above facts at the detention hearing. *Id.* at 112–18. Ruling from the bench, she determined that the Government "met its burden of showing by clear and convincing evidence that no conditions will reasonably assure the safety of others or the community" and ordered Moore detained until trial. *Id.* at 118; *see also* [33]. Moore now moves this Court to review the Magistrate Judge's [33] Order of Detention. [36] at 1; *see also* 18 U.S.C. § 3145.

II.   Standard

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, governs the pretrial release or detention of criminal defendants. *United States v. Byrd*, 969 F.2d 106, 108 (5th Cir. 1992) (per curiam); *see also* Fed. R. Crim. P. 46(a). Under it, a court may order detention "only 'if, after a hearing pursuant to [Section] 3142(f), the judicial officer finds that no condition or combination of conditions [of release] will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Okhumale*, 813 F. App'x 936, 938 (5th Cir. 2020) (per curiam) (quoting *Byrd*, 969 F.2d at 109). Section 3142(f) authorizes the Government to move for a detention hearing in firearm possession cases. § 3142(f)(1)(E). To impose pretrial detention, "the lack of reasonable

5

assurance of either the defendant's appearance, or the safety of others or the community, is sufficient; both are not required." *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992).

Justifying pretrial detention on safety grounds requires the Government to prove by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of the community or another person. § 3142(f); *see also Galaviz v. Reyes*, 95 F.4th 246, 256 (5th Cir. 2024) ("Clear and convincing evidence is a weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.") (cleaned up)). When determining whether imposing conditions would reasonably assure community safety, the judicial officer must consider (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger . . . posed by the person's release." § 3142(g).

The Federal Rules of Evidence "do not apply to the presentation and consideration of information at" detention hearings. *Id.* § 3142(f)(2). Neither does the Confrontation Clause. *See United States v. Clark*, 68 F.3d 467, 1995 WL 581606, at *1–2 (5th Cir. 1995) (per curiam) (unpublished table decision); *see also* 5th Cir. R. 47.5.3 ("Unpublished opinions issued before January 1, 1996, are precedent."); *United States v. Hernandez*, 778 F. Supp. 2d 1211, 1220–27 (D.N.M. 2011) (collecting cases). Since the "right to confrontation is a *trial* right," the

6

Supreme Court "normally has refused to find a Sixth Amendment violation when the asserted interference with cross-examination did not occur at trial." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 54 n.10 (1987) (plurality opinion). Thus, "hearsay testimony is admissible in a detention hearing," even if the rule against hearsay or Confrontation Clause would bar its admission at trial. *Clark*, 1995 WL 581606, at *1–2.

Criminal defendants "ordered detained by a magistrate judge . . . may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." § 3145(b). The district court need not conduct another detention hearing. *United States v. Flores*, 53 F.4th 313, 316 (5th Cir. 2022) (per curiam); *see also United States v. Jordan*, No. 24-60167, 2024 WL 2874559, at *1 (5th Cir. June 7, 2024) (per curiam). But it must "review the evidence de novo and make an independent determination on a pretrial detention order." *Flores*, 53 F.4th at 316 (cleaned up).

III. Analysis

Having reviewed the evidence de novo, the Court finds by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of the community or another person if Moore were released pending trial. *See* § 3142(f). Since the Section 3142(g) factors greatly favor detention, the Court determines that Moore should remain detained until trial.

### A. Nature and Circumstances of the Offense

First, the Government has charged Moore with possession of an illegal machinegun, and he faces up to 10 years' imprisonment. [1] at 1; § 924(a)(2). Capitol Police also stopped Moore in a vehicle that contained four firearms: three Glock handguns modified to operate as machineguns and one AK pistol. [40] at 10–12, 22. Moore and his cousins argued with police when ordered to exit his vehicle. *See id.* at 11. And this happened while each had a machinegun at the ready—unbeknownst to the officers who stopped them. *See id.* This factor favors detention.

### B. Weight of the Evidence

Second, the evidence weighs heavily against Moore. Again, when Capitol Police stopped Moore, his vehicle contained three Glock handguns modified by switches. *Id.* at 10–12, 22. Officers found one of those handguns—which was also stolen—in the center console of Moore's vehicle, and police later found a Glock pistol box in Moore's home bearing the same serial number as that gun. *Id.* at 11–13, 15. On Moore's two cell phones, police found several conversations related to switches, including one in which Moore tried to buy a switch. *Id.* at 16. Moore also appeared in a rap song entitled "Automatic" alongside Bradfield, one of the passengers in Moore's vehicle. *Id.* at 16–17, 21. In that song, Moore raps about switches, and Bradfield holds one of the modified handguns recovered from Moore's vehicle. *Id.* at 17, 22.

Since police matched the serial number of the Glock pistol box in Moore's home with the handgun in Moore's center console, this evidence supports a strong

inference that Moore possessed the modified handgun. Additionally, Moore's conversations about switches and his appearance in "Automatic" establish that Moore knew what switches were and how they worked. This factor also favors detention.

### C.  History and Characteristics of the Person

Third, considering Moore's history and characteristics, the Court notes that Moore currently has no criminal convictions. [41] at 47. Moore's mother testified that he was charged with carrying a small knife to school when he was a juvenile, but that charge was non-adjudicated. *See id.* at 50. She likewise stated that Moore worked as a car dealer and real estate investor. *Id.* at 47. But he now requires a wheelchair and attends physical therapy. *Id.* at 52, 115. Given Moore's lack of criminal history and poor physical condition, this factor favors release.

### D.  Nature and Seriousness of the Danger Posed by the Person's Release

Fourth, the Government presented evidence of Moore's trafficking in machineguns, close ties to violent crimes in Jackson, and threats against other members of the community. To start, Moore's texts showed that he tried to buy a switch, and he and his cousins each had handguns with switches. [40] at 12, 16. The prevalence of switches among Moore's close companions, taken with his attempt to buy one, raises the risk that he could be trafficking switches or arming others with them. *Cf. Rueben*, 974 F.2d at 586 ("[T]he risk of continued narcotics trafficking on bail does constitute a risk to the community.").

Next, Garrett's testimony linked Moore to an attempted murder on Keele Street in July 2024 and a murder on Jamaica Drive in August 2024. [40] at 31.[2] Specifically, (1) a co-conspirator linked Moore to the Keele Street attack; (2) Moore's vehicles were present at both shootings; (3) shell casings from both scenes came from the same weapons; (4) authorities charged Moore with attempted murder for the Keele Street attack; and (5) Moore's half-brother faces a capital murder charge for the Jamaica Drive killing. *Id.* at 23–24, 29–31; [41] at 80–81. Assailants also shot Moore and his passenger on the highway in potential retaliation for the preceding attacks. [40] at 32–33. And after all that, Moore allegedly placed a bounty on family members of the Jamaica Drive murder victim. *Id.* at 33.[3]

In short, Moore was "involved in [two] drive-by shooting[s]," and "acts of violence seem to follow" him. *United States v. Dugas*, No. 6:16-CR-23-1, 2016 WL 1704481, at *4 (W.D. La. Apr. 26, 2016). Worse still, the unsuccessful attempt to murder Moore (and his passenger) on the highway shows that Moore's "release would pose a possible threat to his family members with whom he would live." *Id.*; *see also id.* at *3 (noting that Section 3142(f) does not "require that the defendant be the threat of danger"). Likewise, Moore can still traffic switches, place bounties, and

---

[2] Since the state court judge found Ramsey credible, [46-3], the Court finds no reason to question Garrett's testimony about what Ramsey told him. *See also* [41] at 78–80.

[3] Moore complains that the evidence of this bounty is "hearsay within hearsay, without a scintilla of proof," that violates his "right to confront witnesses against him . . . ." [36] at 4. But neither the rule against hearsay nor the Confrontation Clause applies here. *See Clark*, 1995 WL 581606, at *1–2.

provide logistical support for violent crimes from a wheelchair. This factor also favors detention.

*   *   *

Considering the Section 3142(g) factors, the Court finds clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of the community or another person if Moore were released pending trial.

IV.  Conclusion

For the reasons stated above, the Court DENIES Moore's [36] Motion for Review of the Magistrate Judge's [33] Detention Order. In doing so, the Court has considered all the parties' arguments. Those arguments not addressed would not have altered the Court's decision.

SO ORDERED, this 3rd day of April, 2025.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE
